RICHARD S. DINNER and DOROTHY S. DINNER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Dinner v. Commissioner
Dockets Nos. 1346-72, 1347-72, 1348-72, 1374-72.
United States Tax Court
T.C. Memo 1973-43; 1973 Tax Ct. Memo LEXIS 244; 32 T.C.M. (CCH) 193; T.C.M. (RIA) 73043; February 20, 1973, Filed *244 Marvin D. Morgenstein, for the petitioners. John Gigounas, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following deficiencies in income tax: 2 Docket No.
Year
Amount
1346-72
1966
$22,122.00
1967
5,767.00
1347-72
1966
25,920.32
1967
5,814.72
1348-72
1966
5,281.54
1967
3,330.06
1374-72
1966
32,183.27
1967
22,144.64
1968
5,845.18
The sole remaining issue, after concessions, involves the amount of charitable deductions, if any, that are allowable to petitioners in respect of an alleged bargain sale of certain property to a charitable institution. The sale price was $1,400,000, and petitioners claimed a fair market value of $2,000,000, thus taking deductions measured by their respective interests in excess ($600,000) of such alleged fair market value over the sales price. The only question before us is one of fact, namely, the fair market value of the property at the time of sale. The commissioner determined that its fair market value was not in excess of the sale price. The parties have filed a stipulation of facts which is incorporated herein *245 by reference. The trial was concerned primarily with the question of the fair market value of the property. The Court announced its conclusions at the end of the trial. 3 The principal actor in the transaction before us was petitioner Benjamin H. Swig. Petitioners Melvin M. Swig, Richard L. Swig, and Dorothy Swig Dinner are his children. The other petitioners are their respective spouses. All the petitioners resided in California when the petitions herein were filed. On July 20, 1965, Benjamin H. Swig, on behalf of himself and his three children as well as on behalf of certain other persons, referred to as the Weiler family, acquired a leasehold interest (expiring January 1, 2012) in certain real property in Portland, Oregon. The total purchase price with respect to that acquisition was $1,400,000; 50 percent thereof was allocable to Benjamin H. Swig and his children, and the remaining 50 percent was allocable to the Weilers. On September 20, 1966, the Swigs and the Weilers sold their entire interest in the property to the University of Santa Clara, a charitable institution, for $1,400,000. The Swigs claimed that the property interest thus sold had a fair market *246 value of $2,000,000 at the time of such sale, that the transaction resulted in a charitable contribution of $600,000 to the University, and took deductions on their respective 1966 returns of a proportionate amount of that $600,000, measured by their respective interests in the property. 4 Benjamin H. Swig ("Swig") is a person of considerable wealth. He has made many large contributions to a substantial number of charitable institutions, either individually or through personal foundations controlled by him. One of these institutions was the University of Santa Clara. He was particularly interested in its affairs and welfare, and had previously made substantial contributions to it. Swig and Jack Weiler, the dominant member of the Weiler group, who resided in New York state, engaged in a number of real estate ventures of considerable magnitude throughout the United States, involving hotels, office buildings, and similar properties. Swig and Weiler each acquired a 50 percent interest in each such venture, but the interest of each was generally divided among members of his respective family. Such ventures have uniformly been successful and have involved properties having *247 an aggregate value of between $250,000,000 and $300,000,000. At sometime prior to July 20, 1965, Swig became aware of the fact that certain property in Portland, Oregon, was available for purchase at $1,400,000. Such property had been on the market since October, 1964, and its availability was generally known in the Portland area. The property consisted of the lessee's interest in a ground lease expiring January 1, 2012, covering a full city block (200 feet by 200 feet) in 5 Portland, plus an eight-story office building on the land. The owner of the land had a reversionary interest in the building at the termination of the ground lease. The first two stories on the entire property plus the upper six stories on half of the property were constructed in 1913. The upper six stories on the other half of the property were added in 1923. By 1965, the building was in need of substantial modernization, e.g., the installation of air conditioning, in order to be competitive with other office buildings in Portland, although it did have the advantage of having had new automatic elevators installed in 1960. The property was generally known as the Pittock Block and was located on the *248 fringe of what has been referred to as the "core area" in Portland, consisting of its financial and retail business districts. Swig examined the property, and, based upon his experience in real estate transactions of comparable magnitude, reached the conclusion that it had considerable "potential", that with a certain amount of modernization the rentals could be substantially increased, and that the venture could become very profitable. The property, i.e., the leasehold and building (referred to for convenience hereinafter in the aggregate as the "Pittock property"), was then owned (indirectly through stock interests in a corporation) by a number of persons, including some trustees. 6 On July 20, 1965, Swig, acting on behalf of himself and members of his family as well as on behalf of Weiler and his family, acquired the Pittock property for the $1,400,000 asking price. In accordance with their usual practice Swig and his family acquired a 50 percent interest in the Pittock property and the Weilers the remaining 50 percent. The Swig interest was divided as follows: Benjamin H. Swig
20 percent
Richard L. Swig
10 percent
Melvin M. Swig
10 percent
Dorothy Swig Dinner
10 percent
*249 Shortly after acquisition, the new owners began a program of modernization, beginning with improvement of the appearance of the lobby. However, prior to the expenditure of as much as $30,000 or $35,000 on such program, Swig, with the intention of benefiting the University of Santa Clara, determined to sell the Pittock property to the University for $1,400,000. He had obtained two appraisals of the property, one at $2,000,000 and the other at approximately $2,300,000. The Weilers at first desired to sell their interest to an eastern educational institution, but when it became apparent that it was not feasible to carry out the transaction in that manner, they joined with the Swigs in the sale of the Pittock property to the University of Santa Clara on September 20, 1966, for an aggregate price of $1,400,000. 7 On their returns for 1966, petitioners treated the Pittock property as having a fair market value of $2,000,000 on the date of sale. They considered such sale as the equivalent of a charitable contribution in the aggregate amount of $600,000, and claimed deductions in respect thereof in proportion to their interests, as follows: Benjamin H. Swig
$120,000
Richard L. & Roselyne C. Swig
60,000
Melvin M. and Marcia Swig
60,000
Richard S. & Dorothy Swig Dinner
60,000
*250 The only issue tried before us was the fair market value of the Pittock property as of September 20, 1966. The Government took the position that it did not exceed $1,400,000. Petitioners sought to defend the $2,000,000 figure, and indeed claimed an even higher valuation.We received a mass of evidence on this issue and were aided by the testimony of an expert witness for each side. We heard evidence relating to the condition of the building, the extent of modernization required in order to make it more competitive with newer office buildings, the difficulties growing out of the absence of suitable facilities for parking, the depressing effect of the inability to obtain customery financing by reason of the ground lease, and numerous other factors that were relevant in attempting to fix a value for the property. 8 It would serve no useful purpose to review the evidence or to indicate to what extent and in what particulars we agreed or disagreed with the numerous judgment factors that the experts took into account in reaching their conclusions. Nor is it necessary to set forth the particulars that may have caused us to have less than complete confidence in the testimony of *251 the experts. [2] The matter is not one that is susceptible of a precisely accurate determination. It is one that calls for the exercise of our best judgment on all the materials in the record. Using our best judgment on all the evidence before us we have reached the conclusion and hereby find as a fact that the Pittock property had a fair market value of $1,750,000 on September 20, 1966. The petitioners' charitable deductions in respect of the sale to the University of Santa Clara may be computed accordingly in the Decisions to be entered under Rule 50. *252 Footnotes
1. Cases of the following petitioners are consolidated herewith: Richard L. Swig and Roselyne C. Swig, docket No. 1347-72; Melvin M. Swig and Marcia Swig, docket No. 1348-72; and Benjamin H. Swig, docket No. 1374-72. ↩
2. One example will suffice. In his valuation, petitioners' expert assumed that the anticipated construction of new office buildings in the core area within several years after 1966 would somehow or other be a positive factor in favor of a higher valuation for the Pittock property. Yet it was shown on cross examination that the same expert had made a valuation, for estate tax purposes, in respect of another older office building elsewhere on the fringe of the core area in which he gave his opinion that new construction would have an adverse or depressing effect on the valuation of the older building. His effort on cross examination to reconcile these apparently contradictory views was unconvincing, and it shook our confidence in his testimony to the extent that the exercise of his subjective judgment was involved. ↩